T.C. Memo. 2008-3


UNITED STATES TAX COURT


COUNTRYSIDE LIMITED PARTNERSHIP, CLP HOLDINGS, INC.,
TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3162-05.                    Filed January 2, 2008.


        CS, a limited partnership, owned real property R,
which CS sold in April of year 2.  W and C were members
of CS.  In late year 1, CS redeemed W's and C's
interests in CS by distributing to them its 99-percent
interest in a (newly formed) L.L.C., CLPP, which held a
99-percent interest in a second (newly formed) L.L.C.,
MP.  MP owned four privately issued promissory notes in
the aggregate principal amount of $11.9 million
purchased with (1) an $8.55 million bank loan to CS,
the proceeds of which were contributed by it to CLPP,
which then contributed $8.5 million to MP, and (2) a
$3.4 million bank loan directly to MP.  The notes were
neither listed nor traded on an established financial
market.  On the distribution to W and C, each was
relieved of his share of CS's liabilities, although
each retained, indirectly, his share of MP's
liabilities.  W and C reported no recognized gain on
account of the distribution.  CS elected to step up its
basis in R.

        Respondent alleges:  (1) CLPP, MP, and all of the
late year 1 transactions should be disregarded as

without economic substance and there was, in substance, a cash distribution of over $11 million from CS to W and C or, alternatively, a distribution of "marketable securities", as defined in sec. 731(c)(2), I.R.C., that constituted money for purposes of sec. 731(a)(1), I.R.C., and (2) CS is not entitled to step up its basis in R.

W (a participating partner) moves for partial summary judgment on the issue of whether he and C are required to recognize gain on the year 1 distribution to them (i.e., whether they are deemed to have received money), and he concedes, for purposes of the motion, that CLPP and MP may be disregarded, which results in a deemed distribution of the notes from CS to W and C.

The issue for decision is whether the deemed distribution of the notes from CS to W and C constituted, in substance, a distribution of cash or, alternatively, of "marketable securities".

1. <u>Held</u>: Because the deemed distribution of the notes to W and C (1) accomplished a legitimate business purpose (to enable W and C to convert their shares of CS's equity in property R into interest-bearing promissory notes) and (2) resulted in a change in their economic position, the transactions which enabled them to accomplish that result in a tax efficient manner may not be disregarded for lack of economic substance.

2. <u>Held</u>, <u>further</u>, respondent has failed to demonstrate that there is a genuine issue of material fact regarding the status of the notes as nonmarketable securities.

3. <u>Held</u>, <u>further</u>, CS's deemed distribution of the notes to W and C resulted in nonrecognition of gain to them under secs. 731(a)(1) and 752, I.R.C.

<u>Richard A. Levine</u> and <u>Elliot Pisem</u>, for petitioner and participating partner.

<u>Jill A. Frisch</u>, <u>Barry J. Laterman</u>, and <u>Elizabeth P. Flores</u>, for respondent.

MEMORANDUM OPINION

HALPERN, Judge:  This case is a partnership-level action based upon a petition filed pursuant to section 6226.[1]  The petition was filed in response to respondent's notice of final partnership administrative adjustment (the FPAA) dated October 8, 2004.  The case is before us on a motion for partial summary judgment (the motion) by a participating partner, Arthur M. Winn (participating partner or Mr. Winn), who until December 26, 2000, was a limited partner in Countryside Limited Partnership (Countryside).  Respondent objects.

The FPAA alleges that a distribution by Countryside to Mr. Winn and to Lawrence H. Curtis (Mr. Curtis), another limited partner, on December 26, 2000, in liquidation of their partnership interests in Countryside resulted in $12,055,192 of capital gain to Mr. Winn and Mr. Curtis, cumulatively, for that year.  The FPAA also seeks to (1) deny to Countryside a basis step-up, pursuant to section 734(b)(1)(B), for its property remaining after the distribution to Mr. Winn and Mr. Curtis, (2) require a basis reduction pursuant to section 743(b)(2) for certain notes held by an L.L.C. in which Countryside, through another L.L.C., owned a 98-percent interest, or, alternatively, disregard both L.L.C.s, and (3) impose underpayment penalties under section 6662.

---

[1]  Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year at issue, 2000, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The motion asks that we grant partial summary judgment that (1) Countryside's liquidating distribution to Mr. Winn and Mr. Curtis in 2000 did not result in "a taxable event that gave rise to * * * [income recognized to] Countryside or any of its partners during 2000" and (2) "there is no adjustment to income, gain, loss, deduction, or credit of Countryside or any of its partners for 2000 arising from Countryside."

A hearing on the motion (the hearing) was held in Washington, D.C., on August 15, 2006.

## Background

### Summary Judgment

A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law."  Rule 121(b).  A summary adjudication may be made upon part of the issues in controversy.  Rule 121(a).  In response to a motion for summary judgment or partial summary judgment, "an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 121(d).

### Facts on Which We Rely

On or about September 10, 1993, Countryside was formed as a Massachusetts limited partnership to acquire, finance, own,

develop, rehabilitate, construct, lease, operate, and otherwise deal with real estate.  Sometime thereafter, Countryside acquired, owned, and operated a 448-unit residential property in Manchester, New Hampshire (the Manchester property).

As of January 1, 2000, the partnership interests in Countryside were held as follows:

| General Partners | Interest (%) |
| --- | --- |
| CLP Holdings, Inc.[1] | 1.0 |
| Lawrence H. Curtis | 0.5 |
| William W. Wollinger | 0.5 |
| | |
| Limited Partners | |
| | |
| Arthur M. Winn | 74.2 |
| Lawrence H.  Curtis | 19.3 |
| William W. Wollinger | 4.5 |
| | |
| Total | 100.0 |

[1]  During 2000, Mr. Winn and Mr. Curtis were the sole shareholders and directors of CLP Holdings, Inc.

On or about June 29, 2000, (1) Mr. Winn transferred a 5-percent interest in Countryside to Mr. Curtis in exchange for services performed by Mr. Curtis for Mr. Winn, and (2) both Mr. Curtis and William W. Wollinger (Mr. Wollinger) ceased to be general partners of Countryside as each's 0.5-percent general partnership interest was converted into a 0.5-percent limited partnership interest.  As a result of those changes, and through December 25, 2000, the partnership interests in Countryside were held as follows:

| General Partner | Interest (%) |
|---|---|
| CLP Holdings, Inc. | 1.0 |
| **Limited Partners** | |
| Arthur M. Winn | 69.2 |
| Lawrence H. Curtis | 24.8 |
| William W. Wollinger | 5.0 |
| Total | 100.0 |

On or about September 18, 2000, WMC Realty Corp., by its president, Mr. Winn, formed CLP Promisee L.L.C. (CLPP) under Massachusetts law for the following stated purposes: (1) to engage in the business of making investments in and owning private bonds, notes, leases, debentures, and other nonmarketable securities, (2) to make loans or issue and/or borrow, invest, and lend money, (3) to acquire real or personal property necessary to carry out such purposes, (4) to enter into contracts relating to the same, (5) to engage in any activities directly or indirectly related or incidental to such purposes, and (6) for any other purpose permitted under law. Also, on September 18, 2000, AMW Realty Corp., by its president, Mr. Winn, formed Manchester Promisee L.L.C. (MP) under Massachusetts law for the same stated purposes.

On October 27, 2000, WMC Realty Corp. contributed $86,364 in cash to CLPP in exchange for a 1-percent interest in CLPP, and AMW Realty Corp. contributed $85,859 in cash to MP in exchange for a 1-percent interest in MP.

Sometime in or about October 2000, Countryside borrowed $8.55 million from Columbus Bank & Trust Co. (CB&T), and, on October 30, 2000, (1) Countryside contributed that entire amount in cash to CLPP in exchange for a 99-percent interest in CLPP, and (2) CLPP contributed $8.5 million in cash to MP in exchange for a 99-percent interest in MP. Therefore, on or about October 30, 2000, Countryside was a 99-percent shareholder in CLPP, and CLPP was a 99-percent shareholder in MP.

On or about October 30, 2000, MP borrowed $3.4 million from CB&T. Both CB&T's $8.55 million loan to Countryside and its $3.4 million loan to MP were guaranteed by Mr. Winn, and the loan to Countryside was secured by the Manchester property. Both loans provided interest at an annual rate equal to the London Interbank Offering Rate (LIBOR) plus 175 basis points. The due date was May 1, 2001, for the $8.55 million loan to Countryside and November 1, 2003, for the $3.4 million loan to MP.

On or about October 31, 2000, MP used the $8.5 million received from CLPP and the $3.4 million borrowed from CB&T to purchase four privately issued notes from AIG Matched Funding Corp. (AIG) in the aggregate principal amount of $11.9 million (the AIG notes). The AIG notes were for principal amounts of $6.2 million, $2.6 million, $2.3 million, and $800,000. Each note became due on October 31, 2010, although the holder of each note possessed a right of redemption exercisable, in whole or in part, on the fifth interest payment date (April 30, 2003). Each note provided for interest at an annual rate equal to LIBOR minus

55 basis points, before the fifth interest payment date, and LIBOR minus 35 basis points thereafter.  The AIG notes were neither listed nor traded on an established financial market.

Paragraph 11(b) of the "further provisions" of each note provided, in part, as follows:

> (i) * * * upon the affirmative vote * * *, of the holders of not less than 50 percent in aggregate principal amount of the Notes then Outstanding * * * or * * * with the written consent of the owners of not less than 50 percent in aggregate principal amount of the Notes then Outstanding * * * the Issuer and the Guarantor may modify, amend or supplement the terms of the Notes, in any way * * * provided, however, that no such action may, without the affirmative vote of holders of 100 percent in aggregate principal amount Outstanding of the Notes, * * * change the due date for the payment of principal or interest on the Notes * * * .

As of October 30, 2000, MP assigned to CB&T a security interest in two of the AIG notes, in the principal amounts of $2.6 million and $800,000, as collateral for its $3.4 million loan from CB&T. Pursuant to the terms of the assignment, MP deposited with CB&T all of its right, title, and interest in the assigned AIG notes and all payments under those notes.[2]

On December 26, 2000, Countryside distributed its 99-percent interest in CLPP to Mr. Winn and Mr. Curtis in complete liquidation of their respective partnership interests in Countryside (the liquidating distribution).  As a result of the liquidating distribution, CLP Holdings, Inc., became a 16.7-

---

[2] See app. A for a diagram of the statement of facts to this point.

percent general partner, and Mr. Wollinger became an 83.3-percent limited partner in Countryside.

On or about January 26, 2001, Countryside and Stone Ends Apartments L.L.C. (Stone Ends) executed a purchase and sale agreement for Countryside's sale to Stone Ends of the Manchester property. That agreement was the culmination of negotiations between Countryside and Stone Ends that began with an unsolicited inquiry, in May or June 2000, from a representative of Stone Ends. The sale of the Manchester property closed on or about April 19, 2001, and, on that date or soon thereafter, Countryside repaid to CB&T the $8.55 million loan plus accrued interest.

The AIG notes were redeemed from MP by AIG on or about April 30, 2003.

CB&T's $3.4 million loan to MP was repaid in full on or about January 5, 2004.

Respondent's Motion To Compel Production of Documents

Respondent has moved the Court to compel petitioner (CLP Holdings, Inc.) to produce certain documents (the motion to compel production) as follows:

1. Provide all explanatory or promotional materials related to the proposed and/or actual transactions including but not limited to:

(a) educational, instructional, and informational material;

(b) schematics, diagrams, and charts;

(c) economic, financial, and tax analyses;

(d) documents discussing potential risks and/or benefits associated with the proposed

transaction, including financial risks, tax risks, audit risks;

(e) all other documents relating directly or indirectly to the tax and/or financial consequences of participating in the transaction.

2. Provide all legal, tax, accounting, financial or economic opinions secured or received in connection with the transaction.

Petitioner objects, principally on the grounds of privilege, but has provided to both respondent and the Court a privilege log and a revised privilege log. The revised privilege log lists 20 documents, all of which were (1) either addressed to, received from, or copied to an attorney or C.P.A., (2) described as "advice regarding tax law," and (3) withheld from respondent on the basis of a claimed privilege described, in each case, as "attorney-client; Work Product; §7525."[3] In his response to petitioner's objection to the motion to compel production, respondent does not dispute petitioner's description of the documents as "advice regarding tax law". Rather, he alleges that petitioner failed to sustain its claim that those documents are privileged, and he requests that we "order the documents produced or [,] alternatively, inspect the documents 'in camera' to determine whether the asserted privilege or protection applies."

The Court has not ruled upon the motion to compel production.

---

[3] Sec. 7525(a)(1) provides a limited privilege, equivalent to the attorney-client privilege, to communications regarding tax advice between a taxpayer and "any federally authorized tax practitioner".

Discussion

I.  Internal Revenue Code Provisions and Regulations

   A.  Code Provisions

      1.  Nonrecognition of Gain Issue[4]

_____

[4]  In his objection to the motion, respondent states: "Petitioner's request that the Court determine that no income or gain should be recognized by * * * Mr. Curtis and Mr. Winn is inappropriate * * * [because] the Court does not have jurisdiction over the resulting net tax effect on the partners", citing secs. 6226(f) and 6231(a)(3), which, in effect, limit our jurisdiction in a partnership proceeding to the determination of partnership items as defined in regulations.  In his response, participating partner argues that, under the applicable partnership regulations, the amount and character of the liquidating distribution and Mr. Winn's and Mr. Curtis's bases for their partnership interests in Countryside are partnership items.  He concludes that, because we may make determinations with respect to the amount and character of the liquidating distribution and Mr. Winn's and Mr. Curtis's bases in Countryside, it necessarily follows that we may determine whether the liquidating distribution resulted in gain recognized to them.  Participating partner also points out that respondent's jurisdictional argument is somewhat disingenuous in the light of the fact that the "Explanation of Items" included in the FPAA increases 2000 capital gain to Mr. Winn and Mr. Curtis by $12,055,192. Also, we have examined Exhibit A attached to that explanation, which makes clear that respondent views the liquidating distribution as a distribution of $12,055,192 to Mr. Winn and Mr. Curtis, and he views each as having a zero basis in Countryside, thereby attributing that amount of alleged gain to them.

   We agree with participating partner on this question of jurisdiction.  Although sec. 301.6231(a)(5)-1T(b), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6790 (Mar. 5, 1987), ambiguously provides that "[a] partner's basis in his interest in the partnership is an affected item to the extent it is not a partnership item", in this case, where Mr. Winn's and Mr. Curtis's bases in Countryside are entirely determined by partnership items, i.e., contributions to the partnership and partnership-level operating losses, distributions, and liabilities (see apps. B and C to this report and sec. 301.6231(a)(3)-1(a)(1)(i) and (v), (4)(i) and (ii), Proced. & Admin. Regs.), it is appropriate to determine those bases in a partnership proceeding.  Moreover, as discussed infra, the determinative issue in deciding whether Mr. Winn and Mr. Curtis

(continued...)

The issue of whether any gain should have been recognized to Countryside, Mr. Winn, and/or Mr. Curtis as a result of the December 26, 2000, distribution of Countryside's 99-percent interest in CLPP is governed, in the first instance, by sections 731 through 733 and section 752.

Section 731(a)(1) provides, in pertinent part, that, in the case of a partnership distribution to a partner, gain shall not be recognized to the recipient partner "except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution". Section 731(b) provides: "No gain or loss shall be recognized to a partnership on a distribution to a partner of property, including money."[5] Section 731(c)(1) provides that, for purposes of section 731(a)(1), the term "money" includes "marketable securities", which are to be taken into account at fair market value as of the distribution date. Section 731(c)(2)(A) defines the term "marketable securities" to mean "financial instruments * * * which are, as of the date of distribution, actively traded (within the meaning of section

_____

[4](...continued) have gain recognized to them on the liquidating distribution is whether that distribution constituted, in substance, a distribution to Mr. Winn and Mr. Curtis of either money or "marketable securities", which are treated as money under sec. 731(c)(1). That issue involves a partnership item pursuant to secs. 301.6231(a)(3)-1(a)(4)(ii) and (c)(3)(ii) and (iv), Proced. & Admin. Regs. Therefore, we have jurisdiction to decide the nonrecognition of gain issue.

[5] Respondent does not allege that Countryside recognized gain as a result of the liquidating distribution.

1092(d)(1))."[6]  Section 731(c)(2)(B)(ii) and (v) includes in the meaning of the term "marketable securities" (1) "any financial instrument which, pursuant to its terms or any other arrangement, is readily convertible into, or exchangeable for, money or marketable securities", and (2) "interests in any entity if substantially all of the assets of such entity consist (directly or indirectly) of marketable securities".  The term "substantially all" means 90 percent or more by value.  Sec. 1.731-2(c)(3)(i), Income Tax Regs.

Section 732(b) provides that the basis of property (other than money) distributed by a partnership to a partner in liquidation of the latter's interest shall be an amount equal to the partner's adjusted basis in such partner's interest reduced by any money distributed in the same transaction.

Section 752(a) provides that any increase in a partner's share of the liabilities of a partnership shall be considered as a contribution of money by the partner to the partnership, and section 752(b) provides that any decrease in a partner's share of the liabilities of a partnership shall be considered as a distribution of money to the partner by the partnership. Pursuant to section 733, in the case of a nonliquidating distribution, any such decrease will, first, reduce the partner's basis in the partnership (but not below zero).  To the extent such decrease exceeds the partner's basis in the partnership,

---

[6]  See sec. 1.1092(d)-1(a), Income Tax Regs. ("Actively traded personal property includes any personal property for which there is an established financial market.").

- 14 -

gain is recognized to the partner pursuant to section 731(a)(1).

If a transaction gives rise to both an increase and a decrease in

the partner's share of partnership liabilities or the partner's

individual liabilities, only the net decrease is treated as a

distribution of money to the partner by the partnership.  Sec.

1.752-1(f), Income Tax Regs.

2.  Basis Issues

As noted supra, the FPAA seeks to deny Countryside a basis

step-up for its property remaining after the distribution to Mr.

Winn and Mr. Curtis,[7] and it also challenges the recognition of

MP as holder of the AIG notes with a basis equal to the purchase

price of the notes.  Although those basis issues are not

addressed in the motion, respondent describes them as "integrally

related to the section 731 and section 752 issues", and he cites

the totality of the transactions described supra, and the

elections giving rise to the basis results, as constituting "an

abusive tax avoidance result" (i.e., the indefinite or, possibly,

permanent nonrecognition of the gain on the sale of Countryside's

assets), which should not be given effect.  Because respondent's

position in opposition to the motion relies, in part, upon the

alleged abusiveness of the combination of gain not being

recognized to Mr. Winn and Mr. Curtis, the basis step-up of

_____

[7] Schedule L, Balance Sheets per Books, included in
Countryside's 2000 Form 1065, U.S. Return of Partnership Income,
on lines 9a and 11, reflects an $11,450,498 "step-up" in
Countryside's bases for its "Buildings and other depreciable
assets" and its land ($11,655,277 total yearend basis increase
less $204,779 attributable to amounts expended for depreciable
property during 2000).

Countryside's post-distribution assets, and the failure of MP to "step down" its basis in the AIG notes, all occurring in 2000, we shall summarize the basis adjustments required or authorized under the Code provisions governing liquidating distributions by a partnership.

In pertinent part, section 754 provides that, if a partnership files an election under regulations prescribed by the Secretary, the basis of partnership property is adjusted, in the case of a distribution of property, in the manner provided in section 734. Under section 734(b)(1)(B), in the case of a distribution in liquidation of a partner's interest, a partnership that has a section 754 election in effect shall increase the adjusted basis of partnership property by the excess of the adjusted basis of the distributed property to the partnership immediately before the distribution over the basis of the distributed property to the distributee, as determined under section 732(b). Section 734(b)(1)(B) shall not apply, however, if the distributed property is an interest in another partnership with respect to which a section 754 election is not in effect. Sec. 734(b) (last sentence).[8]

---

[8] Respondent's counsel acknowledges that CLPP had a sec. 754 election in effect at the time of Countryside's distribution of CLPP to Mr. Winn and Mr. Curtis on Dec. 26, 2000. In the light of that election, participating partner takes the position that the last sentence of sec. 734(b) does not apply to that distribution and that, therefore, Countryside is entitled to the reported basis step-up under sec. 734(b)(1)(B) and, as a result, to reduced gain on the 2001 sale of the Manchester property. Those issues of basis step-up and reduced gain are at issue for taxable year 2001 in Countryside Ltd. Pship. v. Commissioner,
(continued...)

Section 743(b) applies to a transfer, by sale or exchange, of an interest in a partnership that has a section 754 election in effect, and section 761(e) provides that any distribution by a partnership of an interest in a partnership shall be treated as an exchange for purposes of section 743. Pursuant to section 743(b)(2) the distributed lower tier partnership must decrease the adjusted basis of its partnership assets by the excess of the transferee partner's proportionate share of the adjusted basis of the partnership property over the basis of the transferee partner's interest in the partnership.[9]

B. Regulations

1. The Subchapter K Antiabuse Regulations[10]

Section 1.701-2, Income Tax Regs., constitutes a two-part antiabuse rule directed at partnerships. The two parts are generally referred to as the "abuse-of-Subchapter-K" rule and the "abuse-of-entity-treatment" rule. See 1 McKee et al., Federal

---

[8](...continued) docket No. 22023-05, which has been continued pending the outcome of this case, although respondent raises the basis step-up issue in this case as well.

[9] The sec. 743(b)(2) basis step-down for CLPP's assets (primarily, its limited partnership interest in MP) is reflected in CLPP's 2000 Form 1065. Because MP did not make a sec. 754 election, it did not step down its basis for its assets (primarily, the AIG notes). Therefore, MP did not report any gain (almost all of which would have been taxable to Mr. Winn and Mr. Curtis as the 99-percent limited partners in CLPP) on the redemption of those notes in 2003.

[10] Subch. K, ch. 1, subtit. A of the Internal Revenue Code (subch. K), is entitled "Partners and Partnerships"; it sets forth the rules for the income taxation of partners and partnerships.

Taxation of Partnerships and Partners, par. 1.05[1], at 1-14 (4th ed. 2007).  Only the first part of the rule (section 1.701-2(a) through (d), Income Tax Regs.) is pertinent to this case.

Section 1.701-2(a), Income Tax Regs., is entitled "Intent of subchapter K".  It states:  "Subchapter K is intended to permit taxpayers to conduct joint business * * * activities through a flexible economic arrangement without incurring an entity-level tax."  It further states that there are three requirements "[i]mplicit in the intent of subchapter K": (1) "The partnership must be bona fide", and the transaction(s) in question "must be entered into for a substantial business purpose", (2) the transaction(s) must not violate substance over form principles, and (3) the tax consequences under subchapter K "must accurately reflect the partners' economic agreement and clearly reflect the partner's income" unless any departure from that standard is "clearly contemplated" by the applicable provision of subchapter K or the regulations thereunder.

Section 1.701-2(b), Income Tax Regs., entitled "Application of subchapter K rules", provides, in pertinent part:

[I]f a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K * * * .  Thus, even though the transaction may fall within the literal words of a particular statutory * * * provision, the Commissioner can determine * * * that to achieve tax results that are consistent with the intent of subchapter K * * *

[t]he claimed tax treatment should * * * be adjusted or modified.

Section 1.701-2(c), Income Tax Regs., applies a facts and circumstances test in order to determine whether "a partnership was formed or availed of with a principal purpose to reduce substantially the present value of the partners' aggregate federal tax liability in a manner inconsistent with the intent of subchapter K", and section 1.701-2(d), Income Tax Regs., contains 11 examples intended to "illustrate the principles of paragraphs (a), (b), and (c)".

### 2. The Section 731 Antiabuse Regulation

Section 1.731-2(h), Income Tax Regs., provides in pertinent part:

> [I]f a principal purpose of a transaction is to achieve a tax result that is inconsistent with the purpose of section 731(c) and this section, the Commissioner can recast the transaction for Federal tax purposes as appropriate to achieve tax results that are consistent with the purpose of section 731(c) and this section. * * *

The regulation invokes a facts and circumstances test and provides three examples. Id. Two find deemed distributions of a partnership's marketable securities to partners, and the third permits a series of distributions of "multiple properties" to be treated as "part of a single distribution".

## II. Arguments of the Parties

### A. Participating Partner

Attached to the motion are exhibits containing computations for Mr. Winn and Mr. Curtis that, for each, show (1) his share of Countryside's liabilities and his adjusted basis in his

Countryside interest as of January 1, 2000, (2) the changes in both his share of those liabilities and that basis between January 1 and the December 26, 2000, liquidating distribution, and (3) the effect of the liquidating distribution on his share of those liabilities.

Participating partner represents that Mr. Winn's adjusted basis in his interest in Countryside immediately before the liquidating distribution to him was $19,937,590, and the amount of money considered distributed to him pursuant to section 752(b) in connection with the liquidating distribution (i.e., the net decrease in Mr. Winn's share of Countryside's and MP's liabilities resulting from the liquidating distribution) was $19,656,762.[11]  Because the net decrease in Mr. Winn's share of those liabilities resulting from the liquidating distribution ($19,656,762) was less than his adjusted basis for his interest in Countryside immediately before that distribution ($19,937,590), Mr. Winn argues that, pursuant to section 731(a)(1) (which limits the gain recognized to a partner on any distribution from a partnership to the amount of money distributed in excess of the partner's adjusted basis in the partnership at the time of the distribution), he realized no gain on the liquidating distribution.

---

[11]  The exhibit states that the liquidating distribution relieved Mr. Winn of $22,142,736 of Countryside's liabilities in existence as of Dec. 26, 2000, but that Mr. Winn's retained liability representing his share of CLPP's share of MP's $3.4 million (plus interest) liability to CB&T was $2,485,974, resulting in net relief from liabilities for Mr. Winn of $19,656,762.

Participating partner submits corresponding computations and makes the same argument with respect to Mr. Curtis; i.e., because the net decrease in Mr. Curtis's share of Countryside's and MP's liabilities resulting from the liquidating distribution (computed to be $7,473,190) was less than his adjusted basis for his interest in Countryside immediately before that distribution (computed to be $7,760,895), pursuant to section 731(a), no gain was recognized to Mr. Curtis on the liquidating distribution.[12]

Participating partner's position that neither Mr. Winn nor Mr. Curtis recognized gain on the liquidating distribution is dependent upon his argument that the AIG notes were not "marketable securities", as defined in section 731(c)(2).[13]  In support of that argument, participating partner has submitted two affidavits.  The first is the affidavit of Leslie J. Nanberg (Mr. Nanberg), a registered investment adviser in Massachusetts and a

---

[12]  Participating partner's computations for Mr. Winn and Mr. Curtis are reproduced as apps. B and C.

[13]  Because the AIG notes constituted more than 90 percent of MP's assets, by value, and CLPP's indirect interest (through MP) in those assets constituted more than 90 percent of CLPP's assets, by value, on the date of the liquidating distribution, Countryside's liquidating distribution to Mr. Winn and Mr. Curtis of a 99-percent interest in CLPP would be treated as a distribution of money, for purposes of sec. 731(a), should the AIG notes be considered marketable securities.  See sec. 731(c)(2)(B)(v); sec. 1.731-2(c)(3)(i), Income Tax Regs. Therefore, the status of the AIG notes as nonmarketable securities (and, therefore, as property other than money for purposes of sec. 731(a)) is crucial to participating partner's position, whether or not we disregard the separate existence of CLPP and MP for Federal income tax purposes and treat the liquidating distribution as a distribution of the AIG notes themselves, an assumed scenario that participating partner concedes for purposes of the motion.

principal in an investment advisory firm (the Nanberg affidavit). Mr. Nanberg professes to be knowledgeable "regarding the trading markets that may exist for various financial instruments and * * * whether or not price quotations therefore [sic] are readily available". Mr. Nanberg, after finding that the AIG notes "were not listed or traded on an established financial market" and that "no such market existed for the * * * [AIG] Notes on Dec. 26, 2000, or at any time thereafter," concludes that the AIG notes "were neither liquid nor easily offset on Dec. 26, 2000 or at any time thereafter." The second is the affidavit of Samuel Ross (Mr. Ross) who, in 2000, was the treasurer of AMW Realty Corp. (the 1-percent general partner in MP) and was personally involved in the negotiation and MP's acquisition of the AIG notes. Mr. Ross states that "[a]ll terms of the transaction in which * * * [MP] acquired the * * * [AIG] Notes are contained * * * [in the notes themselves and in the related documentation]", and "[t]here was no agreement, understanding, or arrangement, written or oral, binding or non-binding, between * * * [MP and AIG] that modifies the terms of * * * [those] documents."

Participating partner argues that respondent's reliance upon the partnership antiabuse rules contained in the regulations is misplaced. He argues that the purpose of respondent's reliance upon section 1.701-2, Income Tax Regs., is unclear; but that, if it is cited in support of respondent's argument that MP must reduce the basis for its assets or, alternatively, that Countryside may not increase the basis for its assets as a result

of the liquidating distribution, that regulation has no bearing on the motion, which is addressed solely to the nonrecognition of gain issue. Participating partner further argues that no matter how respondent recasts the liquidating distribution pursuant to section 1.701-2, Income Tax Regs. (i.e., as distributions of interests in CLPP, MP, or of the AIG notes themselves), respondent has not demonstrated an ability to overcome the facts established by participating partner, which demonstrate that (1) Mr. Winn and Mr. Curtis received nonmarketable securities, and (2) the net decrease in their respective shares of Countryside's and MP's liabilities did not exceed their respective bases in Countryside. Participating partner also dismisses section 1.731-2(h), Income Tax Regs., as inapplicable on the ground that it is applicable only to circumstances "involving changes in partnership allocations with respect to marketable securities and distributions of nonmarketable securities by a partnership that also owns marketable securities," which, in substance, constitute a manipulation by a partner of "the inherent flexibility of the partnership form to acquire an increased interest in marketable securities from a partnership without effecting a transaction in the form of a distribution [of marketable securities]." Participating partner reasons that "the provision should not have any application to a partnership [Countryside] that owns no marketable securities at all, either directly or indirectly."

Participating partner also argues that the cases respondent cites involving the disallowance of deductions arising out of

transactions that lacked business purpose or economic substance are inapposite. That is because none of those cases constitutes authority for disregarding Mr. Winn's and Mr. Curtis's share of MP's $3.4 million debt obligation to CB&T, which must be respected for purposes of applying sections 731(a)(1) and 752 to the liquidating distribution.

Lastly, participating partner argues that respondent has failed to raise any genuine issue of material fact as to whether (1) the AIG notes constituted nonmarketable securities and (2) Mr. Winn's and Mr. Curtis's respective bases for their interests in Countryside exceeded the amount of money they are deemed to have received by virtue of the net decrease in their respective shares of Countryside's liabilities. In this regard, participating partner states that respondent's "theories, assertions, and arguments" (e.g., that there may have been some informal "arrangement" among Mr. Winn, Mr. Curtis, and AIG whereby the AIG notes were readily convertible into, or exchangeable for, money or marketable securities) are insufficient to defeat the motion. In support of that statement, participating partner cites the admonition in Rule 121(d) that "an adverse party may not rest upon the mere allegations or denials of such party's pleading" but, instead, "by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."

B. Respondent

Respondent views the liquidating distribution, Countryside's sale of the Manchester property in 2001, and the redemption of the AIG notes from MP in 2003 as giving rise to a series of "integrally related" transactions pursuant to which "Winn and Curtis effectively control [by means of their continued ownership, through CLPP, of MP] their share of the proceeds from the sale of * * * [the Manchester property], but have permanently sheltered it from tax." Respondent seeks to deny, to Mr. Winn and Mr. Curtis, any deferral, beyond 2000, of their gain attributable to the 2001 sale of the Manchester property. Thus, he takes the position that the liquidating distribution constituted a distribution of money to Mr. Winn and Mr. Curtis; i.e., it was a distribution of money under (1) section 731(c) and/or (2) the antiabuse rule of section 1.731-2(h), Income Tax Regs. In addition, respondent disregards MP's $3.4 million liability to CB&T and Mr. Winn's and Mr. Curtis's respective shares of that liability as offsets, under section 752(a), to the deemed distributions of money to them under section 752(b) (i.e., as offsets to the decrease in their share of Countryside's liabilities arising from the liquidating distribution). Consistently, respondent also disregards the $3.4 million of AIG notes purchased by MP.

Respondent's position with respect to the impact of the liquidating distribution on Mr. Winn's and Mr. Curtis's 2000

Federal tax liabilities is summarized in paragraphs 23(h) and (q) of his amendment to answer as follows:

|  | Mr. Winn | Mr. Curtis |
|---|---|---|
| Sec. 752(b) deemed distribution of money[1] | $14,892,855 | $4,402,714 |
| Sec. 731(c) distribution of money (cash/securities)[2] | 6,345,394 | 2,274,191 |
| Total distribution of money | 21,238,249 | 6,676,905 |
| Basis[3] | (12,879,151) | (3,798,080) |
| Total gain[4] | 8,359,098 | 2,878,825 |

[1] Respondent treats as a distribution of money to Mr. Winn and Mr. Curtis, under sec. 752(b), only the relief from Countryside's liabilities existing as of Jan. 1, 2000. He disregards the additional liabilities triggered by the CB&T loans of $8.55 million to Countryside and $3.4 million to MP, Mr. Winn's and Mr. Curtis's relief from the former, and the modification of their respective shares of Countryside's liabilities resulting from Mr. Winn's transfer of a 5-percent limited partnership interest in Countryside to Mr. Curtis, all of which are taken into account by participating partner on exhibits attached to the motion. See apps. B and C.

[2] These amounts are apparently derived from line 23 (Distributions of property other than money) of Mr. Winn's and Mr. Curtis's Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., attached to Countryside's 2000 return.

[3] Respondent treats as Mr. Winn's and Mr. Curtis's bases in Countryside on the date of the liquidating distribution their bases as of Jan. 1, 2000, thereby disregarding the basis modifications resulting from the CB&T loans to Countryside and MP, Mr. Winn's transfer of a 5-percent limited partnership interest in Countryside to Mr. Curtis, Countryside's cash distributions to Mr. Winn and Mr. Curtis during 2000, and Countryside's 2000 loss, all of which are taken into account by participating partner. See apps. B and C.

[4] The total alleged gain to both Mr. Winn and Mr. Curtis is $11,237,923. That amount differs from both the gain to Mr. Winn and Mr. Curtis alleged in the FPAA ($12,055,192), which respondent conceded at the hearing is incorrect, and the revised alleged gain to Mr. Winn and Mr. Curtis, which respondent's counsel stated at the hearing is $11,427,993. There is no explanation in the record for the discrepancy between the first and third amounts of alleged gain to Mr. Winn and Mr. Curtis.

At the hearing, respondent's counsel conceded that the amounts and computations set forth on the exhibits attached to the motion (appendixes B and C) are arithmetically correct, but respondent disputes participating partner's computational results on the basis of respondent's disregard, for Federal income tax purposes, of the CB&T loans, Mr. Winn's transfer of a 5-percent interest in Countryside to Mr. Curtis, and the formation and separate existence of CLPP and MP. Respondent views those transactions, culminating with the liquidating distribution, as "designed to circumvent the provisions of Subchapter K and [as], in substance, * * * equivalent to a distribution of cash to Winn and Curtis." He further alleges that "[t]he entire series of transactions is a sham and should be disregarded for federal income tax purposes * * * [and] recast * * * in accordance with its substance", which, in respondent's view, is a distribution of cash or a cash equivalent to Mr. Winn and Mr. Curtis.[14]

---

[14] In the FPAA, the only transaction alleged to constitute a "sham", lacking in "economic substance", is the formation and distribution of CLPP and MP, an allegation that participating partner concedes for purposes of the motion. In the amended answer, however, respondent treats as "sham", and disregards for lack of "business purpose" and "economic effect", not only the distribution to Mr. Winn and Mr. Curtis of CLPP and MP, but also the CB&T loans to Countryside and MP and the latter's purchase of the AIG notes, with the result that that "series of transactions" is to be treated as "equivalent to a distribution of cash to Winn and Curtis." Respondent does not, in the amended answer, identify the source of the roughly $8.5 million distribution of money ("Cash/Securities") that he considers Countryside to have distributed to Mr. Winn and Mr. Curtis ($6,345,394 to Mr. Winn and $2,274,191 to Mr. Curtis). At the hearing, however, respondent's counsel acknowledged that the source of that money is the $8.55 million Countryside borrowed from CB&T. She would not, however, acknowledge the reality for tax purposes of the
(continued...)

Respondent relies upon (1) caselaw employing the so-called economic substance doctrine and (2) the subchapter K "anti-abuse" regulations (sections 1.701-2 and 1.731-2(h), Income Tax Regs.), in order to deny the application of the provisions of subchapter K and the regulations thereunder that are relied upon by participating partner, despite literal compliance therewith. Respondent's argument that the post January 1, 2000, transactions lacked "economic substance" is premised on the fact that, because the interest rate on the CB&T loans to CLPP and MP was 230 basis points higher than the rate of interest earned on the AIG notes (the interest detriment), those transactions made "no economic sense".

Respondent also opposes the motion on the ground that there are material issues of fact regarding the true nature of the economic arrangement among the partners in Countryside and the circumstances surrounding the sale of the Manchester property to Stone Ends.  He also alleges that there are material issues of fact regarding the marketability of the AIG notes, i.e., whether there existed an "arrangement" with AIG whereby the notes were "readily convertible" into cash, see sec. 731(c)(2)(B)(ii), and whether CLPP and MP should be disregarded for Federal income tax

---

[14](...continued)
$3.4 million MP borrowed from CB&T because, as she explained, that part of the transaction is "more abusive".  She stated: "Well, the 3.4 is worse than the 8.5 because the 3.4 is down in Manchester, [it is] associated with a note that is pledged to the bank * * *, the interest differential is * * * [against the partnership], and that's basically all that is in that partnership."

purposes. The latter inquiry is relevant solely to the basis

issues[15] because, as noted supra, participating partner concedes

that both CLPP and MP may be disregarded for purposes of the

motion; i.e., for purposes of the nonrecognition of gain issue.[16]

Lastly, respondent asserts that, because issues of (1)

economic substance and (2) tax avoidance motives on the part of

the partners in Countryside in structuring the liquidating

distribution are relevant to our decision on the motion, summary

judgment is precluded until we have resolved respondent's motion

---

[15] For example, if both CLPP and MP are disregarded, Mr. Winn and Mr. Curtis are deemed to have received the AIG notes directly as distributions in liquidation of their interests in Countryside, and, assuming those notes are not treated as money under sec. 731(c)(1)(A), each's resulting basis in his notes is determined from his partnership basis reduced by the amount of his relief from Countryside's liabilities on the distribution date. See secs. 732(b) and 752(b). Stated numerically, according to his computations, Mr. Winn's basis for his share of the AIG notes would be $280,828 ($19,937,590 - $19,656,762) and Mr. Curtis's basis for his share of those notes would be $287,705 ($7,760,895 - $7,473,190). See apps. B and C. Alternatively, if only CLPP is disregarded, then MP's failure to make a sec. 754 election negates any basis step-up to Countryside for the Manchester property. See sec. 734(b) (last sentence).

[16] Respondent asks that, in this case, we address the validity for Federal income tax purposes of CLPP and MP because, assuming we decide that Mr. Curtis and Mr. Winn are not required to recognize gain in 2000, thereby forcing respondent to attempt to attribute taxable gain to them upon the redemption of the AIG notes in 2003, his success in that effort may depend upon whether Mr. Winn and Mr. Curtis are deemed, for Federal income tax purposes, to have received (1) membership interests in CLPP or MP or (2) the AIG notes themselves in 2000. Respondent fears that, if he first raises the L.L.C. validity issue in litigation limited to the 2003 taxable year, he may be whipsawed by a claim that 2000 was the proper year for which to raise that issue. In the light of participating partner's concession, there is no need to address the L.L.C. validity issue in deciding the motion, and we will be able to address respondent's fear of being whipsawed when we resolve any remaining issues in this case.

to compel production. Respondent reasons that the documents sought may be relevant to those issues and that it would be "unfair" to grant the motion without first deciding respondent's motion to compel production.

III. Analysis

A. Impact of Respondent's Motion To Compel Production

We first address respondent's argument that we are precluded from granting partial summary judgment to participating partner until we have decided respondent's motion to compel production.

As noted supra, petitioner's revised privilege log describes all of the documents listed therein and sought by respondent as "advice regarding the tax law." Respondent does not object to that description of the documents, and he is willing to assume arguendo that the only reason for the motion to compel production "is to secure discovery regarding a tax avoidance motive". Participating partner concedes, however, that the liquidating distribution was structured to defer tax by distributing to Mr. Winn and Mr. Curtis property rather than cash. Indeed, he concedes that tax avoidance (or, as participating partner's counsel would prefer to describe it, "tax planning") was the sole motivation for the formation of CLPP and MP, the CB&T loans, and the purchase of the AIG notes, all steps taken to ensure that, in redemption of their partnership interests, Mr. Winn and Mr. Curtis received only property, and no cash. In the light of those concessions, we cannot see how respondent can continue to

argue that there exists an issue as to the existence of a predominant tax avoidance motive.

In support of that argument, respondent notes that, in two complaints filed in the Court of Federal Claims on behalf of CLPP and MP, respectively, it is alleged that both CLPP and MP and the transactions in which they engaged "had economic substance and business purpose and did not have a principal purpose to reduce substantially the present value of * * * [Countryside's] partners' aggregate tax liabilities in a manner inconsistent with the intent of subchapter K."[17]  We also note that, in a case in this Court involving Countryside's 2001 taxable year, <u>Countryside Ltd. Pship. v. Commissioner</u>, docket No. 22023-05 (docket No. 22023-05), respondent denies Countryside's $11,450,498 basis step-up for the Manchester property, pursuant to section 734(b)(1)(B), which results in his increasing Countryside's gain on its 2001 sale of that property by like amount.  Respondent's position in docket No. 22023-05 is premised, in part, upon his disregard, for Federal income tax purposes, of CLPP, which had made a section 754 election, and the failure of MP to make such an election.  See sec. 734(b) (last sentence).  In defending the basis step-up and resulting smaller gain on the sale of the Manchester property, petitioner in docket No. 22023-05 alleges that the FPAA "arbitrarily and erroneously determines that the

---

[17]  Both of those complaints involve challenges to respondent's adjustments to (1) the bases of the members in CLPP for their membership interests therein and (2) MP's bases for its assets.

formation of CLP Promisee was a sham and lacked economic substance * * * [and] that CLP Promisee should be disregarded and all transactions engaged in by CLP Promisee treated as engaged in directly by Countryside".

In both the Court of Federal Claims actions and in docket No. 22023-05, the issue of whether CLPP and/or MP should be disregarded for lack of economic substance and/or business purpose relates solely to the basis issues, not to the issue involved in the motion; i.e., whether the liquidating distribution resulted in the receipt by Mr. Winn and Mr. Curtis of money, thereby causing taxable gain to be recognized to them. Participating partner has, for purposes of that issue, unequivocally conceded both that CLPP and MP may be disregarded and that their formation and utilization to borrow money and purchase the AIG notes were tax-motivated steps undertaken as part of a plan to defer tax by distributing property rather than cash. In the light of those concessions, we reject respondent's argument that we are precluded from granting partial summary judgment to participating partner before deciding respondent's motion to compel production.

B. Economic Substance

1. Introduction

We view the statement in respondent's amendment to answer that, pursuant to the liquidating distribution, Mr. Winn and Mr. Curtis each received an "I.R.C. § 731(c) distribution of money (Cash/Securities)" as respondent's allegation that the AIG notes

constituted marketable securities as defined in section 731(c)(2) or, alternatively, that, even if they were nonmarketable, the lack of economic substance surrounding their purchase and distribution negates the ability of Mr. Winn and Mr. Curtis to achieve nonrecognition of gain under sections 731(a)(1) and 752(a) and (b).[18]  That alternative argument (lack of economic substance) is reiterated by respondent in opposing the motion. We will first address what we consider to be respondent's alternative argument that, even if the AIG notes constituted nonmarketable securities, the liquidating distribution must be considered, in substance, a distribution of cash to Mr. Winn and Mr. Curtis resulting in their recognition of gain.

### 2.  Application of Goldstein v. Commissioner

Respondent seeks to disregard the CB&T loans and the purchase and (because CLPP and MP are to be disregarded for purposes of the motion) deemed distribution of the AIG notes directly to Mr. Winn and Mr. Curtis.  In support of that position, respondent points to the interest detriment, which, combined with transaction costs, necessarily resulted in an arrangement that could not generate a profit to Countryside, and which, therefore, was without business purpose.  The principal authority upon which respondent relies is Goldstein v.

---

[18]  At this point, we use the term "economic substance" without attaching to it a precise meaning but only to encompass the various grounds advanced by respondent for disregarding the tax results claimed by participating partner, e.g., lack of "business purpose or economic effect", a "series of transactions * * * [amounting to] a sham", a "transaction * * * [that] makes no economic sense".

Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965).

In the Goldstein case, the taxpayer (Mrs. Goldstein, the wife in a joint return filing) won over $140,000 in the Irish Sweepstakes. In an effort to mitigate the tax impact of having to report all her winnings in the year of receipt, her advisers constructed a plan pursuant to which, before the end of that year, she borrowed $945,000 from two banks, purchased $1 million face amount Treasury 1.5-percent notes, and prepaid 4 percent interest for 1.5 years on one bank loan and for approximately 2.75 years on the other. The total interest prepayment was over $81,000, which the Goldsteins claimed as a deduction in the year of payment under section 163(a). We denied the deduction on the ground that "there was no genuine indebtedness established between * * * [Mrs. Goldstein] and * * * [the banks]." Goldstein v. Commissioner, 44 T.C. at 298. The Court of Appeals for the Second Circuit affirmed, but on a different basis. It agreed with the dissenting opinion in this Court that the bank loans were "'indistinguishable from any other legitimate loan transaction contracted for the purchase of Government securities'", Goldstein v. Commissioner, 364 F.2d at 737 (quoting Goldstein v. Commissioner, 44 T.C. at 301 (Fay, J., dissenting)), and it found that we were in error in concluding that those loans "were 'shams' which created no genuine indebtedness", id. at 738. It agreed, however, with our finding that Mrs. Goldstein entered into the two bank loans "without any realistic expectation of

economic profit and 'solely' in order to secure a large interest deduction * * * [to offset her sweepstakes winnings]." Id. at 740. The court found that Congress intended to limit interest deductions under section 163(a) to interest on debt incurred for "purposive activity", and it held that that section did not permit a deduction for the interest paid by Mrs. Goldstein where the sole purpose of her borrowings was to generate tax deductible interest. Id. at 740-742.

Because Countryside, like Mrs. Goldstein, could not realistically profit from investing in the AIG notes at a lower rate of return than it was required to pay on the loans used to make that investment, respondent considers the facts in the Goldstein case "analogous" and the result controlling of the result herein. Participating partner responds: "Goldstein, properly understood, stands for the limited proposition that, when a taxpayer * * * [borrows] for the sole purpose of claiming a tax deduction for the interest expense, the interest is not deductible." He notes that the Court of Appeals for the Second Circuit respected the debt as bona fide, while disallowing the interest deduction for lack of any "purposive activity" in incurring the debt. He concludes: "There is no basis for contending that a similar 'purposive activity' concept is present in Code section 752, and there is thus no basis for attempting to extrapolate from Goldstein to the present case." We interpret participating partner's argument to be that, because neither business purpose nor economic substance considerations affect the

validity of Countryside's debt to CB&T (which, pursuant to participating partner's concession that CLPP and MP may be disregarded, includes MP's $3.4 million debt to CB&T), that debt must be accepted as bona fide for purposes of sections 731(a)(1) and 752.

Respondent's reliance on Goldstein founders on the fact that Countryside, rather than Mr. Winn and Mr. Curtis, occupies Mrs. Goldstein's position (paying more interest on the borrowings than was received on the investment purchased with those borrowings). The comparable issue in this case would be whether Countryside is entitled to deduct the interest paid on the loans from CB&T. Respondent has not raised an interest deductibility issue in this case, and there is nothing, on that score, for us to resolve.

The Goldstein case, however, does support respondent's argument that literal compliance with the conditions for the application of a particular Code section (in the Goldstein case, section 163(a); in this case, sections 731(a)(1) and 752) does not mandate application of the section where the transaction giving rise to that application fails to comport with Congress's purpose in enacting the section. The question before the Court of Appeals in Goldstein was, at heart, one of statutory construction, i.e., determining whether, despite the broad scope of section 163(a), Congress intended to allow an interest deduction for interest paid on funds borrowed "for no purposive reason * * * other than * * * securing * * * [a tax] deduction". Goldstein v. Commissioner, 364 F.2d at 742. Courts commonly

consider legislative purpose in construing tax (and other) statutes. See 2A Singer, Sutherland Statutory Construction, sec. 48:3, at 549 (7th ed. 2007). While the precise language of both sections 731(a) and 752 suggests that there is little uncertainty in their application, we cannot lose sight of the fact that both sections are part of a large and complex system of rules for taxing partners and partnerships; viz, subchapter K. The purpose of subchapter K, as set forth in the income tax regulations, is "to permit taxpayers to conduct joint business (including investment) activities through a flexible economic arrangement without incurring an entity-level tax." Sec. 1.701-2(a), Income Tax Regs. Undoubtedly, sections 731(a) and 752 must be construed in the light of the purpose of subchapter K. In the analogous situation of determining whether a transaction fits within the corporate reorganization provisions of the income tax, the Supreme Court, in Gregory v. Helvering, 293 U.S. 465, 469 (1935), famously said:

> The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * *

Participating partner has failed to convince us that, in considering the application of sections 731(a) and 752 to the facts before us, an inquiry is not warranted into whether Countryside, Mr. Winn, and/or Mr. Curtis engaged in any "purposive activity" other than tax avoidance. Indeed, we have held that there are circumstances in which the lack of "purposive

activity" or economic substance will defeat the application of the provisions of subchapter K.  See, e.g., <u>Wilkinson v. Commissioner</u>, 49 T.C. 4, 10-13 (1967) (in which we (1) disregarded, as without "economic significance", the assignment of an installment sale obligation to a partnership owned by the obligees just before the obligees' liquidation of the corporate obligor, in which they were majority shareholders, (2) deemed section 721, which would have protected the obligees from tax on the deferred gain upon a bona fide assignment of the obligation to the partnership, to be inapplicable, and (3) held that the obligees were taxable on the deferred gain upon their liquidation of the corporate obligor); <u>Santa Monica Pictures, L.L.C. v. Commissioner</u>, T.C. Memo. 2005-104 (special allocation rules of section 704(c) and carryover basis rules of section 723 deemed inapplicable to shift built-in losses to the taxpayer in a transaction lacking economic substance).  The question is whether there are circumstances present in this case that negate the application of sections 731(a)(1) and 752(a) and (b) to provide nonrecognition of gain to Mr. Winn and Mr. Curtis on the liquidating distribution.

3.  <u>Did the Transactions in Question Lack Economic Substance</u>?

a.  <u>Introduction</u>

As noted <u>supra</u>, participating partner concedes that the liquidating distribution was structured to defer tax by distributing to Mr. Winn and Mr. Curtis property rather than cash and that tax avoidance was the sole motivation for the formation

of CLPP and MP, the CB&T loans, and the purchase of the AIG notes, all in furtherance of that plan. Because participating partner also concedes that the L.L.C.s may be disregarded for purposes of the motion, the question before us is whether the CB&T loans and the deemed purchase and distribution of the AIG notes by Countryside also must be disregarded for lack of economic substance with the result that the liquidating distribution must be treated as equivalent to a cash distribution to Mr. Winn and Mr. Curtis (despite its literal qualification for nonrecognition of gain under section 731(a)(1)).

      b.  <u>The Caselaw</u>

In section III.B.2., <u>supra</u> we set forth the seminal language from <u>Gregory v. Helvering</u>, <u>supra</u> at 469, requiring an inquiry into what is now generally is referred to as "economic substance" in order to determine whether to give effect to the reorganization provisions of the income tax. We shall make a like inquiry into the economic substance of the liquidating distribution in order to determine whether to give effect to the provisions of subchapter K here in issue; viz, sections 731(a) and 752. That the so-called economic substance doctrine embodies the foregoing principle of <u>Gregory v. Helvering</u>, <u>supra</u>, was recently made clear by the Court of Appeals for the Federal Circuit in <u>Coltec Indus. Inc. v. United States</u>, 454 F.3d 1340, 1353-1354 (Fed. Cir. 2006), which states:

> The economic substance doctrine represents a judicial effort to enforce the statutory purpose of the tax code. From its inception, the economic substance doctrine has been used to prevent taxpayers from

subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit.  In this regard, the economic substance doctrine is not unlike other canons of construction that are employed in circumstances where the literal terms of a statute can undermine the ultimate purpose of the statute.  * * *

The Court also observed that cases applying the economic substance doctrine "recognize that there is a material difference between structuring a real transaction in a particular way to provide a tax benefit (which is legitimate), and creating a transaction, without a business purpose, in order to create a tax benefit (which is illegitimate)."  Id. at 1357.

The Court of Appeals for the District of Columbia Circuit, the court to which an appeal of this case most likely would lie,[19] also recognized the foregoing distinction in Boca Investerings Pship. v. United States, 314 F.3d 625, 631 (D.C. Cir. 2003), phrasing it in terms of the need for a legitimate business purpose:

The business purpose doctrine * * * establishes that while taxpayers are allowed to structure their business transactions in such a way as to minimize their tax, these transactions must have a legitimate non-tax avoidance business purpose to be recognized as legitimate for tax purposes. * * *

See also ASA Investerings Pship. v. Commissioner, 201 F.3d 505, 512 (D.C. Cir. 2000) (in "sham transaction" cases, "the existence of formal business activity is a given but the inquiry turns on

_____

[19]  Because petitioner states in its petition that Countryside had no principal place of business when the petition was filed, barring stipulation to the contrary, the venue for appeal would appear to be the Court of Appeals for the District of Columbia Circuit.  See sec. 7482(b)(1) (flush language) and (2).

the existence of a nontax business motive"), affg. T.C. Memo.
1998-305.  But cf. <u>ACM Pship. v. Commissioner</u>, 157 F.3d 231, 248
n.31 (3d Cir. 1998) ("where a transaction objectively affects the
taxpayer's net economic position * * * it will not be disregarded
merely because it was motivated by tax considerations"), affg. in
part and revg. in part T.C. Memo. 1997-115; <u>N. Ind. Pub. Serv.
Co. v. Commissioner</u>, 115 F.3d 506, 512 (7th Cir. 1997) (the cases
allowing "the Commissioner to disregard transactions which are
designed to manipulate the Tax Code so as to create artificial
tax deductions * * * do not allow the Commissioner to disregard
economic transactions * * * which result in actual, non-tax-
related changes in economic position"), affg. 105 T.C. 341
(1995).[20]

c.  <u>Analysis</u>

In this case, the transactions that respondent seeks to
disregard, the CB&T loans and the deemed purchase of the AIG
notes by Countryside and their distribution to its majority-in-
interest partners, Mr. Winn and Mr. Curtis, were the means

[20]  The last four cited cases illustrate that the economic
substance doctrine has two prongs, an objective prong and a
subjective prong.  The objective prong requires that the
transaction change the taxpayer's economic position; the
subjective prong requires that the taxpayer have a nontax
business purpose for entering into the transaction.  Although
there is apparently some dispute as to the manner in which the
various Courts of Appeals apply the two prongs, see, e.g.,
Stratton, "Government, Tax Bar Disagree Over Impact of Coltec",
2006 TNT 212-1 (Nov. 2, 2006), it appears that the Court of
Appeals for the District of Columbia Circuit has applied them
disjunctively; i.e., a transaction will satisfy the economic
substance doctrine if it satisfies either the objective or
subjective prong of the test, see <u>Horn v. Commissioner</u>, 968 F.2d
1229, 1237-1238 (D.C. Cir. 1992), revg. T.C. Memo. 1988-570.

employed by Mr. Winn and Mr. Curtis, and agreed to by Countryside, to allow Mr. Winn and Mr. Curtis to withdraw from the partnership before the anticipated sale of the Manchester property to Stone Ends. While the employed means were designed to avoid recognition of gain to Mr. Winn and Mr. Curtis, those means served a genuine, nontax, business purpose; viz, to convert Mr. Winn's and Mr. Curtis's investments in Countryside into 10-year promissory notes, two economically distinct forms of investment.[21]

The Court of Appeals for the Second Circuit considered an analogous set of facts in Chisholm v. Commissioner, 79 F.2d 14 (2d Cir. 1935), revg. 29 B.T.A. 1334 (1934). In Chisholm, the taxpayer and the four other shareholders of a corporation granted a 30-day option to buy their shares in the corporation to a third-party corporation that, during the option period, gave the optionors its nonbinding commitment to exercise the option before it expired. The optionors were advised that, by forming a partnership to sell the shares, they might postpone and, possibly, escape the taxes that would otherwise become due on the exercise of the option and their sale of the shares. For that reason, they transferred the shares to a newly formed

---

[21] While CLP Holdings, Inc., and Mr. Wollinger, Countryside's remaining partners, enjoyed 100 percent of the benefits associated with Countryside's ownership of the Manchester property following Mr. Winn's and Mr. Curtis's withdrawals as partners, they also bore 100 percent of the burdens associated with that ownership. In other words, their economic positions also changed as a result of the liquidating distribution.

partnership, which sold the shares to the corporate buyer upon the latter's exercise of the option and continued to hold and reinvest the proceeds of sale on behalf of its partners.  Writing for the court, Judge Learned Hand noted that the case was "on all fours" with a previous decision of the court, Helvering v. Walbridge, 70 F.2d 683 (2d Cir. 1934) (holding that, when partners transfer property to a partnership that then sells the property, taxation of any pretransfer appreciation in the property's value must await dissolution of the partnership) except for the fact that, in Chisholm, the partnership "was formed confessedly to escape taxation."  Chisholm v. Commissioner, supra at 15.  Citing Gregory v. Helvering, 293 U.S. 465 (1935), Judge Hand observed that the Supreme Court "was solicitous to reaffirm the doctrine that a man's motive to avoid taxation will not establish his liability if the transaction does not do so without it", and he concluded:  "The question always is whether the transaction under scrutiny is in fact what it appears to be in form".  Id.  He further stated that "purpose may be the touchstone, but the purpose which counts is one which defeats or contradicts the apparent transaction, not the purpose to escape taxation which the apparent, but not the whole, transaction would realize."  Id.  He determined that the taxpayer's purpose, "to form an enduring firm which should continue to hold the joint principal and * * * invest and reinvest it", was a legitimate business purpose.  Id.  The court held for the taxpayer.

In another analogous case, Hobby v. Commissioner, 2 T.C. 980 (1943), in order to avoid anticipated redemptions of certain preferred shares of stock and taxation of the resulting gain at short-term capital gain rates, the taxpayer sold the shares to friends before the scheduled redemptions, and he reported long-term capital gains on the sales. The taxpayer's friends paid for the shares with borrowed funds. The taxpayer incurred no liability for repayment of those loans. The Commissioner sought to disregard the taxpayer's stock sales as tax-motivated and determined that the taxpayer's gain was a short-term gain on the redemption of the shares. Citing Chisholm v. Commissioner, supra, we noted that the taxpayer's "primary purpose to realize the gain was a legitimate business purpose, even though it also had a collateral favorable tax effect", and held for the taxpayer. Hobby v. Commissioner, supra at 985. Citing Hobby, we reached the same result in Beard v. Commissioner, 4 T.C. 756 (1945), a case involving facts virtually identical to those in Hobby. In Beard v. Commissioner, supra at 758, by making the following observation, we echoed Judge Hand's admonition in Chisholm v. Commissioner, supra at 15, that the issue "always is whether the transaction under scrutiny is in fact what it appears to be in form": "The Commissioner is * * * required to tax * * * [the taxpayer] in accordance with what occurred, and he is not permitted to distort the transaction by giving it an artificial character upon which a larger tax could be imposed if it were true."

In this case, what "occurred" was a distribution of nonmarketable[22] notes in redemption of limited partnership interests. Countryside undertook the distribution in order to eliminate Mr. Winn and Mr. Curtis as limited partners. Mr. Winn and Mr. Curtis agreed to the redemption in order to convert their interests in Countryside into interest-bearing promissory notes. All of the parties to the transaction had legitimate business purposes, and the manner in which those parties accomplished those purposes cannot be disregarded and converted by respondent into a transaction (an exchange of Mr. Winn's and Mr. Curtis's interests in Countryside for cash) that never occurred simply because the transaction that did occur was tax motivated or, as we stated in Hobby v. Commissioner, supra at 985[23] "had a

---

[22] As noted supra, we interpret respondent's alternative argument (i.e., alternative to his argument that the AIG notes were marketable) to be that, even if the AIG notes were nonmarketable, nonrecognition of gain under secs. 731(a)(1) and 752 is not achievable because of the lack of economic substance.

[23] While we have not undertaken an exhaustive analysis of all cases in which the Commissioner has invoked the economic substance doctrine, we have not found any case applying that doctrine in the manner sought by respondent herein. For example, in Coltec Indus. Inc. v. United States, 454 F.3d 1340 (Fed. Cir. 2006), Boca Investerings Pship. v. United States, 314 F.3d 625 (D.C. Cir. 2003), and ACM Pship. v. Commissioner, 157 F.3d 231 (3d Cir. 1998), affg. in part and revg. in part T.C. Memo. 1997-115, the tax-motivated transaction and/or the resulting favorable tax impact on the taxpayer were simply disregarded. In Del Commercial Props., Inc. v. Commissioner, 251 F.3d 210 (D.C. Cir. 2001), affg. T.C. Memo. 1999-411, and H.J. Heinz Co. v. United States, 76 Fed. Cl. 570 (2007), the transaction that, in fact, did occur was recast for tax purposes by disregarding only the tax-motivated steps. In Gregory v. Helvering, 293 U.S. 465 (1935), and Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965), the transaction that did occur
(continued...)

collateral favorable tax effect."  Moreover, that transaction changed Mr. Winn's and Mr. Curtis's economic positions, thereby satisfying both prongs of the economic substance doctrine.  See supra note 20.  Likewise, the transaction changed the economic positions of Countryside and its remaining partners, CLP Holdings, Inc., and Mr. Wollinger, who, through Countryside, increased their collective percentage ownership in the Manchester property to 100 percent.

Respondent points to the interest detriment as his principal justification for (1) disregarding, for lack of economic substance, the transactions culminating in the liquidating distribution and (2) substituting a deemed taxable distribution of cash to Mr. Winn and Mr. Curtis.  But, as noted supra, the ultimate transaction (the distribution to Mr. Winn and Mr. Curtis of the AIG notes) did accomplish a legitimate economic or business purpose and altered Mr. Winn's and Mr. Curtis's economic positions, as well as the economic positions of Countryside and its remaining members, which gave it economic substance.  The interest detriment suffered by Countryside was an added, and very minor, cost of the transaction by which Mr. Winn's and Mr. Curtis's interests in the partnership were eliminated.[24]

_____

[23](...continued)
was acknowledged to have occurred, but the sought-after tax result was denied as contrary to legislative intent.

[24]  As noted supra note 14, respondent considers MP's $3.4 million borrowing to be "more abusive" than Countryside's $8.55 million borrowing.  Although we find neither borrowing to be "abusive", we surmise that, whereas the $8.55 million borrowing
(continued...)

Morever, none of respondent's arguments that a decision on the motion is either unwarranted or premature in the absence of additional fact finding are persuasive.

Respondent argues that Mr. Winn's continuing guaranties to CB&T and to Federal Home Loan Mortgage Corporation, issued in connection with the CB&T loans to Countryside and MP,[25] and his

_____

[24](...continued)
was needed to provide funds for the AIG notes that were to constitute the nontaxable distribution to Mr. Winn and Mr. Curtis of their equity in the Manchester property, MP's $3.4 million borrowing, and Mr. Winn's and Mr. Curtis's assumption of virtually all of the obligation to repay it by virtue of their continuing ownership (through CLPP) of MP, served only to work a reduction in the amount of money deemed distributed to them under secs. 731(a) and 752(b) on account of the liquidating distribution. Without that borrowing, and Mr. Winn's and Mr. Curtis's subsequent assumption of almost all of the obligation to repay it, they would have been deemed on account of the liquidating distribution (and their concomitant relief from Countryside's liabilities) to have received distributions of money from Countryside ($19,805,893 for Mr. Winn and $7,526,666 for Mr. Curtis) in excess of their respective bases in Countryside ($17,600,747 for Mr. Winn and $6,923,414 for Mr. Curtis). See apps. B and C. A gain would thus have been recognized to each under sec. 731(a) ($2,205,146 for Mr. Winn and $603,530 for Mr. Curtis). Apparently, in order to avoid that gain, Mr. Winn and Mr. Curtis arranged with Countryside for a distribution of encumbered property (in effect, almost $3.4 million of equally encumbered AIG notes), which reduced the amount of money deemed distributed to them under secs. 731(a) and 752(b). While presumably a step taken for tax avoidance reasons, it was part of a transaction that resulted in a change in the form of Mr. Winn's and Mr. Curtis's investments (from limited partners to interest-bearing note holders), which, for the reasons stated herein, we view as imbued with economic substance. Moreover, from Countryside's standpoint, the $3.4 million borrowing, at least in terms of cashflow, was not at all "abusive" because the accrued interest (and, hence, the entire interest detriment) with respect to that borrowing became the indirect obligation of Mr. Winn and Mr. Curtis upon the liquidating distribution. See apps. B and C.

[25] In October 2000, Mr. Winn guaranteed Countryside's repayment to CB&T of a $3 million standby letter of credit with

(continued...)

and Mr. Curtis's indirect interest in Stone Ends, acquired before the closing of Stone Ends' purchase of the Manchester property,[26] show that they (and Mr. Winn in particular) maintained a "continuing economic interest" in the Manchester property after it was purchased by Stone Ends, which distinguishes this case from both Chisholm v. Commissioner, 79 F.2d 14 (2d Cir. 1935), and Hobby v. Commissioner, 2 T.C. 980 (1943). Respondent also argues that Mr. Winn "was apparently confident that the sale of the [Manchester] property * * * would occur" (and that, therefore, Countryside would receive the funds needed to repay the CB&T loans) when he executed the various guaranties of Countryside's and MP's debt to CB&T in 2000. Respondent concludes: "Further discovery on whether there was an agreement regarding the sale of * * * [the Manchester property], before the date of the purchase agreement, should be permitted."

We do not agree that Mr. Winn's and Mr. Curtis's "continuing economic interest" in the Manchester property after the 2001 purchase of the property by Stone Ends in any way compromises the status of Chisholm and Hobby as supporting authorities for

---

[25](...continued)
respect to which Federal Home Loan Mortgage Corp. (FHLMC) was made the beneficiary. FHLMC required the letter of credit in connection with CB&T's $8.55 million loan to Countryside in order to protect its position as party to a credit enhancement agreement with Countryside.

[26] In order to provide Stone Ends with sufficient capital to consummate its purchase of the Manchester property from Countryside, an L.L.C. that was 98 percent owned by Mr. Winn and Mr. Curtis family trusts acquired a 24.22-percent membership interest in Stone Ends on Mar. 28, 2001, in exchange for a capital contribution of $2,337,703.

participating partner's position.  That continuing interest does not alter the controlling fact that, in 2000, Mr. Winn and Mr. Curtis disposed of their partnership interests in Countryside in exchange for nonmarketable securities.[27]  Moreover, the fact that Stone Ends required an additional infusion of capital in 2001 before it could purchase the Manchester property from Countryside at the agreed-upon purchase price negates the idea, suggested by respondent, that there was a "done deal" for the sale of that property to Stone Ends in 2000, even assuming that the parties had reached an informal agreement regarding the terms and conditions of sale during that year.  See Chisholm v. Commissioner, supra at 15 (agreement to exercise option "was legally a nullity" since it did not correspond to the terms of the option contract requiring payment, and not merely a promise to pay, for exercise).  Under the circumstances, we do not see how respondent's position could be enhanced by additional discovery regarding the existence of an informal agreement for the sale of the Manchester property in 2000.

---

[27]  Respondent also attempts to distinguish Hobby v. Commissioner, 2 T.C. 980 (1943), on the basis of our emphasizing in Hobby that the taxpayer did not cosign or guarantee the loans to his friends that enabled them to purchase his shares, whereas Mr. Winn did guarantee the loans used to purchase the AIG notes. In Hobby, however, the taxpayer received cash for his shares, and it was important to find that that cash came from the purchasers, not the redeeming corporation, a finding that would have been compromised if, in substance, the taxpayer had financed the purchase of his own shares; i.e., had, in effect, used his friends as conduits to deliver his shares to the redeeming corporation in exchange for cash.  In this case, Mr. Winn's guaranties helped to finance Countryside's (and MP's) acquisition of nonmarketable securities, his receipt of which does not trigger taxable gain under sec. 731(a)(1).

Nor do we agree with respondent that there is a need for additional discovery of Mr. Winn, Mr. Curtis, their associates, and others "regarding the purpose and effect" of the transactions at issue and the reason for Mr. Winn's transfer of a 5-percent interest in Countryside to Mr. Curtis.  There is no dispute that the purpose of the transactions at issue was to enable Mr. Winn and Mr. Curtis to exchange their limited partnership interests in Countryside for the AIG notes, and the means selected to accomplish that goal were concededly tax motivated.  Moreover, Mr. Winn's transfer of a 5-percent interest in Countryside to Mr. Curtis has no bearing on the tax results to Mr. Winn and Mr. Curtis on the exchange of their interests in Countryside for the AIG notes because, as participating partner points out, even if that transfer had not taken place, their tax bases in Countryside still would have exceeded their net liability relief under section 752(a) and (b), resulting in no gain to either under section 731(a)(1).

In short, respondent, in finding a lack of economic substance, has erroneously focused on the tax-motivated means instead of the business-oriented end.  The transaction requiring economic substance is Countryside's redemption of Mr. Winn's and Mr. Curtis's partnership interests therein.  That the redemption of a partnership interest in exchange for bona fide promissory notes issued by an independent third party can serve a legitimate business purpose is beyond cavil.  The question is whether such a redemption may be respected for tax purposes if the means

undertaken to accomplish it are chosen for their tax advantage. On the facts before us, we conclude that the answer is yes.

### d. Conclusion

Respondent's proposed adjustment may not be sustained, and the application of sections 731(a)(1) and 752 may not be rejected, on the ground that the liquidating distribution lacked economic substance.

### C. Marketability of the AIG Notes

#### 1. Introduction

As noted supra, participating partner has submitted two affidavits in support of his position that the AIG notes were not "marketable securities" within the meaning of section 731(c)(2). The first is the Nanberg affidavit, in which Mr. Nanberg, a registered investment adviser, concludes that the AIG notes "were not listed or traded on an established financial market and no such market existed for the * * * Notes on December 26, 2000, or at any time thereafter." On that basis, participating partner argues that the AIG notes do not constitute "marketable securities" under the general definition of that term in section 731(c)(2)(A). The second affidavit is the Ross affidavit, which was submitted in response to respondent's argument that an issue of fact exists as to whether the AIG notes constituted marketable securities under section 731(c)(2)(B)(ii). That section provides that the term "marketable securities" includes any financial instrument that "pursuant to its terms or any other arrangement, is readily convertible into, or exchangeable for, money or

marketable securities". In his affidavit, Mr. Ross states that all of the relevant terms of the transaction in which MP acquired the AIG notes are contained in the notes themselves or in related documentation (which is attached to the affidavit), and that no "agreement, understanding, or arrangement" existed that would have modified the terms of the referenced documentation.

Respondent "agrees and would stipulate that the [AIG] Notes * * * were not traded on an established securities market." We interpret that statement as respondent's concession that the AIG notes did not constitute marketable securities on the ground that they were "actively traded (within the meaning of section 1092(d)(1))." See sec. 731(c)(2)(A); sec. 1.1092(d)-1(a), Income Tax Regs. Therefore, the issue regarding the marketability of the AIG notes is whether, pursuant to any term of those notes (or the related documentation) or any "arrangement" between MP and CB&T, those notes were readily convertible into money or marketable securities, thereby causing the notes to be "marketable securities" under section 731(c)(2)(B)(ii).

2. <u>Written Terms and Conditions of the AIG Notes</u>

During the hearing, respondent's counsel argued that there is a factual issue regarding the marketability of the AIG notes because (1) under paragraph 11(a) and (b) of the "further provisions", the notes are renegotiable upon the agreement of all holders and (2) there is only one holder (MP or, for purposes of the motion, Countryside), so unanimous agreement "shouldn't be too much of a problem". Respondent's counsel was referring

specifically to paragraph 11(b), which provides that the due date for payment of principal or interest may be changed only upon "the affirmative vote of holders of 100 percent in aggregate principal amount Outstanding of the Notes".  Under paragraph 11(b), that vote by the holders would merely enable the parties (the debtor, the issuer, and the guarantor) to renegotiate ("modify, amend or supplement") the payment due date.  During the hearing, respondent's counsel acknowledged that, if the mere right to renegotiate the terms of a note renders it marketable, all promissory notes that did not specifically prohibit renegotiation would have to be considered marketable.  Morever, respondent's posthearing memorandum of law does not reiterate his reliance on paragraph 11(b) as grounds for treating the AIG notes as marketable securities.  Rather, he stresses the likelihood that AIG would, in fact, accommodate any request by participating partner to modify or restructure the terms of the AIG notes.  On the basis of his posthearing submissions, we interpret respondent's position to be that the right to seek to renegotiate the terms of the AIG notes does not, in and of itself, render the AIG notes marketable under section 731(c)(2)(B)(ii) but, rather, indicates the presence (or, at least the possibility, requiring further factual inquiry) of an "arrangement" to modify the notes in accordance with participating partner's desires, including the desire to "readily exchange the AIG * * * notes for cash."

### 3. Existence of an Arrangement To Convert the AIG Notes to Cash at the Holder's Request

During the hearing, the Court, citing Rule 121(d), admonished respondent's counsel that her objection to the motion was not accompanied by affidavits, nor had she moved for additional discovery regarding the existence of a prohibited "arrangement".  Subsequently, respondent's counsel attempted to obtain an affidavit from Kurt Nelson (Mr. Nelson), a vice president at AIG during 2000-2002, who was personally involved in the transactions pursuant to which MP purchased the AIG notes and a related company, AMWLHC Bostonian Promisee L.L.C. (BP), purchased $19 million in promissory notes from AIG (the BP-AIG notes).  The affidavit sought by respondent's counsel was to state that, if requested by a client, "it would be AIG's practice" to (1) renegotiate the terms of its notes, "provided it was in AIG's own economic or client-relationship interest", and (2) "provide a bid to * * * [purchase its notes] provided the purchase did not affect AIG's own cash management needs."  Mr. Nelson refused to sign the requested affidavit and, instead, executed an essentially identical affidavit with the important exception that he would represent only that AIG "would consider" renegotiating or modifying the terms of the AIG notes or providing a bid to repurchase the notes.

As evidence of an "arrangement" to permit the AIG notes to be "readily convertible" into cash, respondent cites correspondence among representatives and employees of AIG and associates of Mr. Winn establishing that AIG was willing to

structure the BP-AIG notes in accordance with instructions received from the prospective client's representative, and that, after issuance, AIG was willing to modify those notes in accordance with the purchaser's wishes, even at a possible financial loss.

We do not agree that any of the documents respondent refers to constitute evidence of an "arrangement" that would render the AIG notes marketable under section 731(c)(2)(B)(ii).

AIG's willingness to "consider" a modification or repurchase of the AIG notes does not constitute evidence of an "arrangement" to convert the AIG notes into cash or marketable securities at MP's request, as it would be no more than standard business practice for a bank or financial institution to at least consider a customer's request to modify the terms of its notes. Morever, respondent's counsel has made no representations to the Court that she is able to get Mr. Nelson or anyone else on behalf of AIG to testify that it was AIG's "practice" to renegotiate the terms of or to repurchase its notes.

Nor did AIG's willingness to structure and, subsequently, restructure the BP-AIG notes in accordance with the customer's wishes at a probable overall loss (on account of transaction costs) indicate that the parties were not operating at arm's length then or later in connection with the AIG notes. An e-mail from Mr. Nelson makes clear that that willingness (and, in particular, the willingness to modify the note terms) was a

business decision in that he hoped it would assure the customer's purchase of a second note from AIG.[28]

Lastly, respondent suggests that a factual issue as to the marketability of the AIG notes is indicated by AIG's willingness to allow the BP-AIG notes (and, therefore, by implication, the AIG notes) to secure a collateralized bank line of credit. Here again, the line of credit and the collateral therefor, including the pledge of the BP-AIG notes, were all transactions negotiated between parties operating at arm's length. There is no evidence of any prior arrangement between BP and AIG that the BP-AIG notes would be used to secure the line of credit, and, even if there had been, we do not agree that such an arrangement would have justified treating the BP-AIG notes (and, by implication, the AIG notes) as marketable securities. It is common to use property, including a personal residence, to secure a bank loan or line of credit, but that fact does not lead to the conclusion that such property "is readily convertible into, or exchangeable for, money or marketable securities" within the meaning of section 731(c)(2)(B)(ii).

4. Conclusion

Respondent has failed to satisfy the conditions of Rule 121(d) by submitting affidavits or otherwise setting forth facts to show there is a genuine issue of material fact that would cast doubt upon the status of AIG notes as nonmarketable.

---

[28] The e-mail states: "I realize that they could go elsewhere for the 2nd note, but I think AIG should get some points for accommodating the revisions to the previous note."

D.  Applicability of Rule 121(e)

On October 31, 2006, we filed respondent's motion, pursuant to Rule 121(d), to submit supplemental affidavits.  In paragraph 5 of her declaration submitted in support of that motion, respondent's counsel states that "because the facts are in control of Petitioner, Participating Partner and third parties, Respondent is unable to present additional facts to support its opposition to * * * [the motion]."  In the body of that motion, respondent argues that the foregoing "Paragraph 5 * * * like Paragraph 38 of * * * [a prior declaration submitted by respondent's counsel] sets forth reasons supporting why Participating Partner's Motion for Partial Summary Judgment should be denied".  In support of his argument, respondent cites Rule 121(e), which provides as follows:

> (e) When Affidavits Are Unavailable:  If it appears from the affidavits of a party opposing the motion that such party cannot for reasons stated present by affidavit facts essential to justify such party's opposition, then the Court may deny the motion or may order a continuance to permit affidavits to be obtained or other steps to be taken or may make such other order as is just.  If it appears from the affidavits of a party opposing the motion that such party's only legally available method of contravening the facts set forth in the supporting affidavits of the moving party is through cross-examination of such affiants or the testimony of third parties from whom affidavits cannot be secured, then such a showing may be deemed sufficient to establish that the facts set forth in such supporting affidavits are genuinely disputed.

By order dated April 18, 2007, we denied respondent's motion to file supplemental affidavits because of (1) respondent's inability (both past and prospective) to obtain the affidavit

requested of Mr. Nelson and (2) the fact that counsel's declaration did "not contain any relevant facts and is essentially an untimely presentation of additional argument in opposition to Participating Partner's Motion for Partial Summary Judgment." We now address respondent's suggestion, in connection with that motion, that Rule 121(e) provides grounds for the denial of the instant motion.

In her prior declaration, respondent's counsel alleges the existence of "discoverable facts sufficient to raise or further support the existence of * * * material issues of fact". She argues that "[d]iscovery from and cross examination of" Mr. Winn, his partners and employees, AIG, and Stone Ends are "necessary to secure complete information regarding the purpose and effect of the transaction * * * the reason for the 5-percent transfer between Winn and Curtis * * * [and] whether there was an agreement regarding the sale of * * * [the Manchester property] prior to the date of the purchase agreement and at the time of the transaction in dispute."

As discussed supra, (1) participating partner concedes that the "purpose" of the transactions at issue was tax minimization, a concession that does not result in a denial of the motion; (2) the 5-percent transfer from Mr. Winn to Mr. Curtis does not affect the tax results of the transactions at issue and is, therefore, not material; and (3) there would be no adverse impact upon participating partner's position were we to find that there was an informal (unwritten) agreement, in 2000, regarding the

terms of the 2001 sale of the Manchester property to Stone Ends.
Moreover, regarding the "effect of the transaction", we note that
respondent has already undertaken extensive discovery, and it is
sheer speculation on the part of respondent's counsel that, by
additional discovery or (in a Perry Mason moment) by cross-
examination, she will be able to elicit an admission from any of
the potential witnesses that there was a binding "arrangement" to
allow the holder readily to convert the AIG notes into cash or
marketable securities.  Indeed, both the Ross affidavit and the
fact that the AIG notes were held for 2-1/2 years before
redemption on the fifth interest payment date, in accordance with
their terms, clearly indicate that that was not the case.  Under
the circumstances, respondent has not persuaded us that he will
be able to raise, through additional discovery, cross-
examination, or otherwise, a genuine issue of material fact
regarding the marketability of the AIG notes.  Therefore, we find
no basis for denying the motion or ordering a continuance
pursuant to Rule 121(e).

    E.  <u>Applicability of the Antiabuse Regulations</u>

       1.  <u>Section 1.701-2, Income Tax Regs.</u>

The first of the three requirements "[i]mplicit in the
intent of subchapter K" is that "[t]he partnership must be bona
fide" and the transactions in question "must be entered into for
a substantial business purpose."  Sec. 1.701-2(a), Income Tax
Regs.  Respondent does not dispute that Countryside is a bona
fide partnership, and we have found herein that the transactions

in question were undertaken for a "substantial business purpose"; i.e., to enable Mr. Winn and Mr. Curtis to withdraw their investments in Countryside by exchanging their limited partnership interests for the AIG notes.  We have also found that the transactions in question satisfied the second requirement; i.e., that they not violate substance over form principles.  <u>Id.</u> Both in form and in substance, Mr. Winn and Mr. Curtis are deemed to have exchanged interests in a real estate partnership for promissory notes.  Therefore, the remaining issue is whether the transactions in question satisfy the third requirement; i.e., that the tax consequences under subchapter K clearly reflect income and, if not, that the departure from that standard be "clearly contemplated" by the applicable provisions of subchapter K (in this case, sections 731(a)(1) and 752).  <u>Id.</u>

Respondent, by attributing gain to Mr. Winn and Mr. Curtis on the deemed receipt of the AIG notes in exchange for their interests in Countryside, takes the position that their reporting of no gain on that transaction did not clearly reflect their income.  Under section 1.701-2(b), Income Tax Regs., in cases in which there is not a clear reflection of income, the Commissioner may "recast the transaction for federal tax purposes" if the partnership has been "formed or availed of in * * * a transaction a principal purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K". Because we find that the transaction (1) was imbued with economic

substance and (2) did, in fact, result in Mr. Winn's and Mr. Curtis's receipt of nonmarketable securities, we find that their reporting of no gain on the receipt of the AIG notes, pursuant to section 731(a)(1), clearly reflected their income from that transaction.  Therefore, petitioner's reporting of the liquidating distribution as a distribution of property other than money may not be "adjusted or modified" pursuant to section 1.701-2(b)(5), Income Tax Regs.[29]

        2.  <u>Section 1.731-2(h), Income Tax Regs.</u>

Participating partner argues, on the basis of the illustrative examples contained in section 1.731-2(h), Income Tax Regs., that "the provision should not have any application to a partnership that owns no marketable securities at all, either directly or indirectly".  Respondent describes that argument as expressing "the untenable position" that section 1.731-2(h), Income Tax Regs., does not apply "to situations where partnerships create purportedly nonmarketable securities to

---

[29]  It may be that the totality of the actions taken by Countryside, including the formation of CLPP and MP, the sec. 754 elections by Countryside and CLPP, and the absence of a sec. 754 election by MP, present grounds for concluding that there was not a proper reflection of income thereby invoking the application of sec. 1.701-2, Income Tax Regs. (and/or the economic substance doctrine), in order to determine whether to deny a basis step-up for Countryside's assets (i.e., the Manchester property) and/or either disregard CLPP and MP as sham entities or require a basis step-down for the AIG notes held by MP.  See sec. 1.701-2(d), <u>Example</u> (<u>8</u>), Income Tax Regs.  But the issues concerning Countryside's basis in the Manchester property or the holder's (or deemed holder's) basis in the AIG notes pursuant to the interaction among secs. 734(b), 743(b), and 754 are not germane to the motion.  Therefore, we do not address those issues.

distribute in lieu of marketable securities, or cash, to avoid section 731(c)."

We interpret respondent's statement as expressing tacit agreement with participating partner that if, in fact, the AIG notes were not marketable securities, as defined in section 731(c)(2), then section 1.731-2(h), Income Tax Regs., is inapplicable to Countryside's deemed distribution of the AIG notes to Mr. Winn and Mr. Curtis. Because we have concluded that the AIG notes did not constitute marketable securities, we assume that respondent would concede that section 1.731-2(h), Income Tax Regs., is inapplicable to the distribution of those notes.

In any event, we agree with participating partner that each of the three examples contained in section 1.731-2(h), Income Tax Regs., the first of which involves a change in partnership allocations or distribution rights with respect to marketable securities, the second, a distribution of substantially all of the partnership assets other than marketable securities, and the third, a distribution of multiple properties to one or more partners at different times, involves circumstances that are not present in this case. We also note that, in the preamble to the final regulations under section 731(c), the Commissioner, in response to a taxpayer request that there be "examples illustrating abusive transactions intended to be covered by * * * § 1.731-2(h)", stated that "the text of the regulations adequately describes several situations that would be considered abusive * * *, and * * * additional examples are unnecessary."

T.D. 8707, 1997-1 C.B. 128, 130.  Thus, the examples contained in the regulation, which are the only portion of the text of the regulation describing "situations that would be considered abusive", presumably illustrate the universe of circumstances considered abusive for purposes of section 731(c).[30]

Countryside's deemed distribution of the AIG notes to Mr. Winn and Mr. Curtis was not part of an abusive transaction as described in section 1.731-2(h), Income Tax Regs.

IV.  Conclusion

We conclude that the liquidating distribution, conceded by participating partner (for purposes of the motion) to be a distribution of the AIG notes, constituted a distribution of nonmarketable securities resulting in nonrecognition of gain to

---

[30]  In a recent article, Gall & Franklin, "Partnership Distributions of Marketable Securities", 117 Tax Notes 687, 710 (Nov. 12, 2007), the authors conclude that neither the examples in the legislative history of sec. 731(c)(7) (which authorizes regulations "necessary or appropriate to carry out the purposes of * * * [sec. 731(c)], including regulations to prevent the avoidance of such purposes") nor the examples in the antiabuse regulation itself "involve the extension of the rules of section 731(c) to treat an asset that is not a marketable security as a marketable security."

the recipients, Mr. Winn and Mr. Curtis, pursuant to sections 731(a)(1) and 752. Therefore, we shall grant the motion.[31]

An order granting participating partner's motion for partial summary judgment will be issued.

---

[31] If all of respondent's arguments in this case, docket No. 22023-05, and the Court of Federal Claims actions instituted by CLPP and MP were to be sustained, the overall effect would be to tax the gain realized on the sale of the Manchester property three times: First, in 2000, to Mr. Winn and Mr. Curtis on the liquidating distribution, a second time, in 2001, to Countryside on the sale of the Manchester property, and a third time, in 2003, on AIG's redemption of the AIG notes from MP. We suspect that respondent's position in these actions is intended to completely offset what respondent considers to be participating partner's and petitioner's goal of deferring indefinitely any tax on that gain and to avoid any possibility of being whipsawed. In addressing the motion, we decide only that the gain is not recognized to Mr. Winn and Mr. Curtis in 2000 upon their receipt of a 99-percent limited partnership interest in CLPP or, alternatively, upon their deemed receipt of the AIG notes.

APPENDIX A



APPENDIX B

**Computation of Winn's Share of Countryside LP (Countryside) Liabilities
and Winn's Basis in His Countryside Interest Immediately Before the 12/26/00 Distribution**

I.  **Computation of Winn's share of Countryside liabilities and Winn's basis in his Countryside interest as of 1/1/00**

   A.  **As of 1/1/00, Winn's share of Countryside liabilities was $14,892,855.  See (1) below.**

   B.  **As of 1/1/00, Winn's basis in his Countryside interest was $12,879,151.  See (2) below.**

| Year | Basis at start of period | Contributions/(distributions) of money during period | Taxable income/(loss) for period[1] | Increase/(decrease) in share of liabilities for period | Basis at end of period |
|------|------|------|------|------|------|
| 1993 | -0- | $742 | ($34,939) | $13,044,133 | $13,009,936 |
| 1994 | $13,009,936 | -0- | (427,037) | 2,956,835 | 15,539,734 |
| 1995 | 15,539,734 | -0- | (366,595) | 27,937 | 15,201,076 |
| 1996 | 15,201,076 | -0- | (156,275) | (326,417) | 14,718,384 |
| 1997 | 14,718,384 | (122,509) | (234,813) | (70,092) | 14,290,970 |
| 1998 | 14,290,970 | (37,500) | (32,357) | (231,673) | 13,989,440 |
| 1999 | 13,989,440 | (111,469) | (490,952) | (507,868) | **12,879,151 (2)** |
| Total | | | | **14,892,855 (1)** | |

[1] For 1993 through 2000, there was no partnership tax-exempt income and no nondeductible partnership expenditures as described in sec. 705(a)(1)(B) and (2)(B).

II.  **Events from 1/1/00 until immediately before the 12/26/00 distribution affecting Winn's share of Countryside liabilities and Winn's basis in his Countryside interest**

   A.  **Winn's share of Countryside liabilities immediately before the 12/26/00 distribution**

$14,892,855    **Winn's share of liabilities as of 1/1/00**
  (1,003,562)    **Decrease in share of liabilities attributable to transfer of a 5-percent interest.  See (1) below.**
   5,916,600    **Winn's share of the Countryside-CB&T $8,550,000 liability.  See (2) below.**
   2,336,843    **Winn's share of MP's $3,445,506 of liabilities.  See (3) below.**
  22,142,736    **Winn's share of Countryside liabilities immediately before the 12/26/00 distribution**

   (1)  On 6/29/00, Winn transferred a 5-percent interest in Countryside to Countryside partner Curtis.  This transfer decreased Winn's percentage interest in Countryside from 74.2 percent to 69.2 percent.  The transfer resulted in a $1,003,562 decrease in Winn's share of Countryside liabilities, computed as Winn's $14,892,855 share of Countryside liabilities as of Jan. 1, 2000, multiplied by 5/74.2.

   (2)  In October 2000, Countryside borrowed $8,550,000 from Columbus Bank & Trust Co. (CB&T).  Winn's 69.2-percent share of this liability was $5,916,600.

   (3)  In October 2000, Manchester Promisee L.L.C. (MP) borrowed $3,400,000 from CB&T.  In addition, on 12/26/00, MP had accrued $45,506 of unpaid interest expense.  Immediately before the 12/26/00 distribution, Countryside owned 99 percent of CLP Promisee L.L.C. (CLPP) which, in turn, owned 99 percent of MP.  Therefore, Countryside's share of MP's liabilities was $3,376,940.  Winn's share of Countryside's share of this liability was $2,336,843, computed as $3,445,506 x 99% x 99% x 69.2%.

**B. Winn's basis in his interest in Countryside immediately before the 12/26/00 distribution**

| | |
|---|---|
| $12,879,151 | Winn's basis as of 1/1/00 |
| 7,249,881 | Net increase in Winn's share of liabilities.  See (1) below. |
| (59,942) | Money distributed to Winn.  See (2) below. |
| (131,500) | Winn's share of Countryside's loss.  See (3) below. |
| 19,937,590 | Winn's basis in his Countryside interest immediately before the 12/26/00 distribution |

(1)  As calculated in II.A., Winn's share of Countryside liabilities increased from $14,892,855 as of 1/1/00 to $22,142,736 immediately before the 12/26/00 distribution, a net increase of $7,249,881.

(2)  Winn received a distribution during that period of $59,942 in money per Schedule K-1.

(3)  Winn's share of taxable income/(loss) for that period was ($131,500) per Schedule K-1.

## III.  Effect of distribution to Winn in redemption of his interest in Countryside

**A. The 12/26/00 distribution to Winn in redemption of his interest in Countryside reduced Winn's share of liabilities as follows:**

| | |
|---|---|
| $22,142,736 | Winn's total share of liabilities before the 12/26/00 redemption |
| (2,485,974) | Winn's continued liability.  See (1) and (2) below. |
| 19,656,762 | Net decrease in Winn's share of liabilities |

(1)  Under sec. 1.752-1(f), Income Tax Regs., only the net decrease in a partner's share of liabilities is treated as a distribution of money to the partner.

(2)  Countryside distributed a 72.88-percent interest in CLPP to Winn in redemption of his interest in Countryside.  As a result, Winn was relieved of his $22,142,736 share of Countryside liabilities, but Winn retained a liability representing his share of CLPP's share of MP's liabilities.  Winn's share of these liabilities was $2,485,974, computed as $3,445,506 x 99% x 72.88%.  Thus, the net decrease in Winn's share of liabilities was $19,656,762.

**B. Because the $19,656,762 decrease in liabilities was less than Winn's $19,937,590 basis in his interest in Countryside, Winn recognized no gain on the distribution in redemption.  See (1) below.**

(1)  Under sec. 731(a), no gain is recognized upon a distribution to a partner except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution.

## APPENDIX C
### Computation of Curtis's Share of Countryside LP (Countryside) Liabilities
### and Curtis's Basis in His Countryside Interest Immediately Before the 12/26/00 Distribution

I. Computation of Curtis's share of Countryside liabilities and Curtis's basis in his Countryside interest as of 1/1/00

    A. As of 1/1/00, Curtis's share of Countryside liabilities was $4,402,714. See (1) below.

    B. As of 1/1/00, Curtis's basis in his Countryside interest was $3,798,080. See (2) below.

| Year | Basis at start of period | Contributions/(distributions) of money during period | Taxable income/(loss) for period[1] | Increase/(decrease) in share of liabilities for period | Basis at end of period |
|------|---|---|---|---|---|
| 1993 | -0- | $198 | ($9,325) | $3,546,894 | $3,537,767 |
| 1994 | $3,537,767 | -0- | (113,954) | 869,828 | 4,293,641 |
| 1995 | 4,293,641 | -0- | (97,825) | 13,449 | 4,209,265 |
| 1996 | 4,209,265 | -0- | (41,702) | (115,511) | 4,052,052 |
| 1997 | 4,052,052 | (60,000) | (62,658) | (71,564) | 3,857,830 |
| 1998 | 3,857,830 | (30,000) | (8,634) | (30,695) | 3,788,501 |
| 1999 | 3,788,501 | (49,725) | (131,009) | 190,313 | 3,798,080 (2) |
| Total |  |  |  | 4,402,714 (1) |  |

[1] For 1993 through 2000, there was no partnership tax-exempt income and no nondeductible partnership expenditures as described in sec. 705(a)(1)(B) and (2)(B).

II. Events from 1/1/00 until immediately before the 12/26/00 distribution affecting Curtis's share of Countryside liabilities and Curtis's basis in his Countryside interest

    A. Curtis's share of Countryside liabilities immediately before the 12/26/00 distribution

| | |
|---|---|
| $4,402,714 | Curtis's share of liabilities as of 1/1/00 |
| 1,003,562 | Increase in share of liabilities attributable to transfer of a 5-percent interest. See (1) below. |
| 2,120,400 | Curtis's share of the Countryside-CB&T $8,550,000 liability. See (2) below. |
| 837,481 | Curtis's share of the MP's $3,445,506 of liabilities. See (3) below. |
| 8,364,157 | Curtis's share of Countryside liabilities immediately before the 12/26/00 distribution |

      (1) On 6/29/00, Curtis acquired a 5-percent interest in Countryside from Countryside partner Winn. This transfer increased Curtis's percentage interest in Countryside from 19.8 percent to 24.8 percent. The transfer resulted in a $1,003,562, increase in Curtis's share of Countryside liabilities, computed as Winn's $14,892,855 share of Countryside liabilities as of Jan. 1, 2000, multiplied by 5/74.2.

      (2) In October 2000, Countryside borrowed $8,550,000 from Columbus Bank & Trust Co. (CB&T). Curtis's 24.8-percent share of this liability was $2,120,400.

      (3) In October 2000, Manchester Promisee L.L.C. (MP) borrowed $3,400,000 from CB&T. In addition, on 12/26/00, MP had accrued $45,506 of unpaid interest expense. Immediately before the 12/26/00 distribution, Countryside owned 99 percent of CLP Promisee L.L.C. (CLPP) which, in turn, owned 99 percent of MP. Therefore, Countryside's share of MP's liabilities was $3,376,940. Curtis's share of Countryside's share of this liability

was $837,481, computed as $3,445,506 x 99% x 99% x 24.8%.

**B. Curtis's basis in his interest in Countryside immediately before the 12/26/00 distribution**

| | |
|---|---|
| $3,798,080 | Curtis's basis as of 1/1/00 |
| 3,961,443 | Net increase in Curtis's share of liabilities.  See (1) below. |
| (21,482) | Money distributed to Curtis.  See (2) below. |
| 22,854 | Curtis's share of Countryside's income.  See (3) below. |
| 7,760,895 | Curtis's basis in his Countryside interest immediately before the 12/26/00 distribution |

(1) As calculated in II.A., Curtis's share of Countryside liabilities increased from $4,402,714 as of 1/1/00 to $8,364,157 immediately before the 12/26/00 distribution, a net increase of $3,961,443.

(2) Curtis received a distribution during that period of $21,482 in money per Schedule K-1.

(3) Curtis's share of taxable income/(loss) for that period was ($22,854) per Schedule K-1.

---

**III. Effect of distribution to Curtis in redemption of his interest in Countryside**

**A. The 12/26/00 distribution to Curtis in redemption of his interest in Countryside reduced Curtis's share of liabilities as follows:**

| | |
|---|---|
| $8,364,157 | Curtis's total share of liabilities, before the 12/26/00 redemption |
| (890,967) | Curtis's continued liability.  See (1) and (2) below. |
| 7,473,190 | Net decrease in Curtis's share of liabilities |

(1) Under sec. 1.752-1(f), Income Tax Regs., only the net decrease in a partner's share of liabilities is treated as a distribution of money to the partner.

(2) Countryside distributed a 26.12-percent interest in CLPP to Curtis in redemption of his interest in Countryside.  As a result, Curtis was relieved of his $8,364,157 share of Countryside liabilities, but Curtis retained a liability representing his share of CLPP's share of MP's liabilities.  Curtis's share of these liabilities was $890,967, computed as $3,445,506 x 99% x 26.12%.  Thus, the net decrease in Curtis's share of liabilities was $7,473,190.

**B. Because the $7,473,190 decrease in liabilities was less than Curtis's $7,760,895 basis in his interest in Countryside, Curtis recognized no gain on the distribution in redemption.  See (1) below.**

(1) Under sec. 731(a), no gain is recognized upon a distribution to a partner except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution.